IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

---

FRANK W. JACKSON,                  :
                                   :
         Plaintiff,                :
                                   :
v.                                 :        Civil Action No. 2:06cv88
                                   :
DONALD C. WINTER,                  :
Secretary of the Navy,             :
                                   :
         Defendant.                :

---

### OPINION AND ORDER

Plaintiff Frank W. Jackson ("Jackson"), a fifty-six (56) year old African-American male, brought this Title VII action after being denied a promotion by the Military Sealift Fleet Support Command ("MSFSC"),[1] which is part of the United States Navy's Military Sealift Command ("MSC").  Plaintiff Jackson was ranked seventh out of eleven candidates by a mixed race and gender panel of four supervisors.  The Navy selected the top ranked candidate for promotion.  Because Jackson has no evidence that the panel's decision was pretextual or that he was retaliated against for complaining about its decision, the Court will **GRANT** the Secretary of the Navy's Motion for Summary

---

[1] The MSFSC was formerly known as the Sealift Logistics Command Atlantic (SEALOGLANT) and the Military Sealift Command Atlantic (MSCLANT).  MSFSC and MSC are collectively referred to herein as "the Navy."

Judgment.  (Docket No. 11.)

## I.  Factual and Procedural History[2]

On July 13, 2002, Charles Goring retired from his position as a Supervisory Contract Specialist ("SCS") in the MSFSC office located at Camp Pendleton, Virginia.  At the time of Mr. Goring's retirement, Ms. Deidre Fisher ("Fisher"), formerly Diedre Rumsey, was Director of the Camp Pendleton office.  Fisher is a thirty-nine (39) year old African-American female.  As the Director, Fisher was responsible for recommending a candidate to fill the newly created job vacancy.

Since 1992, plaintiff Jackson has worked as a paygrade GS-12 Contract Specialist at the MSFSC Camp Pendleton office in the Contracts and Business Management Department.  Jackson applied for a promotion to Mr. Goring's former job, which was a GS-13 position.

## A.  Developing a Pool of Candidates

In the summer of 2002, Fisher began the process to fill the vacant SCS position.   Fisher sent a request for personnel action

---

[2]In deciding the Motion for Summary Judgment, the Court must view the facts, and the inferences reasonably drawn from those facts, in the light most favorable to plaintiff Jackson.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Smith v. Cont'l Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004); Nguyen v. CNA Corp., 44 F.3d 234, 237 (4th Cir. 1995).

to the Navy Human Resources Office ("HRO") located in Norfolk, Virginia, seeking a list of qualified candidates from the Standard Automated Inventory and Referral System ("STAIRS"). STAIRS is a resume banking system through which federal employees may archive their resume for future job vacancies.  When performing STAIRS inquiries, HRO searches the resume data bank to identify candidates via a key-word search customized to the job description and criteria provided by the requesting manager.

The STAIRS inquiry for the SCS vacancy produced a list of twenty (20) candidates.  Only two were MSC employees.  Neither Jackson nor the woman who ultimately got the job, Ms. Jamie Filler, were on the list.  (Docket No. 22, Ex. 6.)  In July 2002, HRO provided the list to Fisher in the form of a Certificate ("STAIRS Certificate").  After reviewing the STAIRS Certificate, Fisher decided not to choose any of the candidates listed. Jackson speculates that Fisher was unhappy with the STAIRS Certificate because it did not include Filler, who he claims was Fisher's preselected favorite.

Fisher next requested that HRO issue an external (i.e., public) announcement of the job vacancy.[3]  In February 2003, HRO compiled a list of the qualified candidates who responded to the external announcement and sent it to Fisher in the form of a

_____

[3]Defendant disagrees with this contention and instead asserts that Fisher requested both an internal STAIRS and an external public announcement for the vacancy when she first contacted HRO.  Defendant does agree that Fisher received the STAIRS Certificate first and returned it to HRO before she received the external announcement Certificate.

Certificate ("External Certificate").  The External Certificate contained a list of five qualified candidates, including Filler and three military veterans.  (Docket No. 22, Ex. 12.)  Fisher decided not to select a candidate through this process either.

When selecting a candidate from an external announcement, the responsible official must choose one of the top three candidates specified by the External Certificate, and a military veteran generally may not be passed over in favor of a non-veteran.  5 C.F.R. § 332.404(a)-(b).  Jackson speculates that Fisher chose not to fill the SCS position from the External Certificate because three candidates who are veterans received the top three ratings, making it impossible to select Filler.

Nearly a year after the SCS position became vacant, Fisher made a second STAIRS inquiry.  HRO generated a second STAIRS Certificate that included a list of 31 eligible candidates. Filler and plaintiff Jackson were not on the list.  (Docket No. 22, Ex. 17.)  Unsatisfied with the second STAIRS Certificate, Fisher took over the recruitment process by developing a Solicitation of Interest ("SOI") to add additional candidates to the selection pool.

The SOI process was different from HRO's vacancy announcements in that it allowed Fisher herself to draft the announcement and send inquiries directly to potential candidates. Fisher drafted and circulated the SOI announcement via email to all employees at MSFCS.  After hearing from a colleague that two GS-13 employees at MSC headquarters were interested in a lateral

transfer to the SCS position, she forwarded the SOI announcement as an email attachment to their supervisor.  In that email, Fisher asked that the SOI also be forwarded to any other interested GS-13 candidates.  The SOI announcement asked that interested candidates provide a resume and contact Fisher directly.

Utilizing both the second STAIRS Certificate and the responses to her SOI announcement, Fisher identified eleven candidates, including Jackson and Filler, who were both qualified and interested in the SCS position.  These eleven candidates were then submitted to a selection panel for consideration.

B.   Job Qualifications

As part of the application process, each candidate submitted a computer generated resume and application that listed their prior experience and qualifications.  Plaintiff Jackson's resume was poorly written and contained numerous grammatical errors. For example, the first page contains the following: "My day to day responsibilities, is contract administration . . .;" "As an experience ACO, I have performed the greater majority of the functions listed at FAR part 42;" and "Based on information that was reported to me, I advised and direct course of action to follow . . . ."  (Docket No. 23, Ex. 1.)  Jackson's descriptions of his prior job experiences lack organization and detail.  The descriptions are more akin to round-a-bout discussions as opposed to logical summaries of his responsibilities and accomplishments

while working in these  positions.

Plaintiff Jackson's application lists the following
education and professional qualifications:

EDUCATION:

New York University; New York, N.Y.; Professional Arts;
1987; Master; 48 Hours

Fairleigh  Dickinson  University;  Rutherford,  N.J.;
Business Management; 1979; Bachelor; 128 Semester Hours

City  University  of  New  York;  Brooklyn,  N.Y.;
Hotel/Restaurant Management; 1973; Associate; 64 Semester
Hours

PROFESSIONAL TRAINING:
Energy Management Professional Enhancement Program 08-93
to 07-94
Executive Contract Management 40hrs, 1993
Microsoft PowerPoint 40hrs, 1992
Microsoft Excel 40hrs, 1992
Microsoft Word 40hrs, 1992
Contract Law 80hrs 1988
Cost and Price Analysis 80hrs, 1984
Supervisors for First Line Managers 1982

PROFESSIONAL LICENSES AND CERTIFICATES:
DAWIA Level III Certification (Contracting), 05-98

(Docket No. 23, Exhibit 1.)  Jackson's most relevant job

experience was a GS-12 SCS position that he held temporarily from

February 1992 until June 1996.

Filler had been employed by MSC since April 1992.  The

resume that she submitted was well written.  It contained

detailed information presented in an organized manner, and it is

apparent that she spent a significant amount of time in its

preparation.  On her application for the SCS position, Filler

listed the following education and professional qualifications:

EDUCATION:

Clinton Central High School; Clinton, NY; 1971; High School Diploma

State University of N.Y. at Morrisville; Morrisville, N.Y.; Hotel, Restaurant & Institutional Food Management; 1973; Associate, 3.32 GPA, 4 Point Scale; 66 Semester Hours

Limestone College; Gaffney, SC 29340; Business Management; 1995; No Degree; 3.5 GPA, 4 Point Scale; 6 Semester Hours

Dundalk Community College; Baltimore, MD 21222; Business Management; 1996; No Degree; 4 GPA, 4 Point Scale; 3 Semester Hours

PROFESSIONAL TRAINING:
Government Contract Costs, 24hrs, 3-87; Management of Defense Acquisition Contracts (Basic), 160hrs, 8-87; Advanced Procurement Management, 40hrs, 12-87; Government Contract Negotiation Techniques, 40hrs, 5-88; Management of Defense Acquisition Contracts (Advanced), 120hrs, 10-88; Acquisition Streamlining, 24hrs, 6-90; Defense Contracting Negotiation Workshop, 40hrs, 6-90; Defense Cost and Price Analysis, 80hrs, 6-90; Government Contract Law, 80hrs, 9-92; Advanced Contract Administration, 80hrs, 5-92; Introduction to Supervision, 40hrs, 4-93; Supervision and Group Performance, 40hrs, 7-93; Best Value Procurement, 40hrs, 10-95; Contracts Course for the Standard Procurement System, 40hrs, 2-00.

PROFESSIONAL LICENSES AND CERTIFICATES:
DAWIA Level II Certification (Contracting), 06-94.

(Docket No. 23, Ex.2.)  Filler's most relevant job experience was a GS-12 SCS position that she held temporarily from April 1992 until March 1996.

The parties dispute whether Jackson or Filler spent the most time previously working as a GS-12 SCS.  For purposes of this Opinion and Order, the Court will assume that Jackson spent slightly more time working in the relevant position than did Filler.

C.   The Selection Process

While Fisher searched for candidates, she also searched for interview panelists.  In June 2002, Fisher contacted MSC headquarters by email for recommendations of GS-14 employees to sit on the selection panel.  From those recommended, Fisher chose two GS-14 Supervisory Contract Specialists, Kenneth Allen and Achille Broennimann, both of whom are Caucasian males.  She also selected Mr. Francis Cunningham, a Caucasian male GS-13 Supervisory Mechanical Engineer, to serve on the panel.  Mr. Cunningham worked for the Navy Fleet Auxiliary Force in Virginia Beach, Virginia and would be supported by the individual promoted to the vacant SCS position.  The complete panel was comprised of Fisher and her three selectees.

Fisher created a two-part process for the selection panel to evaluate the candidates.  First, each panelist other than Fisher separately reviewed and rated the applicants' resumes.  Filler's resume received the top rating of 95.67.  Plaintiff Jackson and four other candidates tied for second place with a rating of 92.33.

Next, each candidate was interviewed by the panel utilizing ten questions prepared by Fisher.  According to panelist Broennimann, Jackson's interview answers "were technically correct, but they were very short in terms of detail."  (Docket 22, Ex. 66 at 10.)  In contrast, Broennemann stated that in addition to giving technically correct answers, Filler "also gave greater detail and came up with solutions to some of the problems

8

in terms of how we could still meet a particular mission."
(Docket No. 22, Ex. 66 at 11.)

According to panelist Allen, Jackson's interview answers "were not as articulate or in-depth as certain of the other candidates," and Filler "was one of the, if not the most stellar person from the interview."  Allen stated that Filler's "answers were well thought out, concrete examples, more lengthy and in-depth that showed what her experience and capabilities would be." (Docket No. 22, Ex.67 at 6.)

Panelist Cunningham recalled Jackson's interview performance as "[p]oor.  His answers to the questions were short and vague and not detailed, or, you know, there was a lot of questions . . . which asked for examples and experiences in certain areas, and he didn't address them in detail at all."  (Docket No. 22, Ex. 68 at 10.)  In reference to Filler's interview performance, panelist Cunningham stated:

> She had one of the best, if not the best interview.  And the main reason was for all of the relevant examples and experiences.  Whenever we asked a question, she provided a relevant answer and then went on to say, and I was actually in that specific area, and this is an example of a similar situation, and this was the remedy that I applied, and these were the results.

(Id. at 12.)

The panelists, Fisher included, provided separate ratings for each candidate's interview.[4]  Filler received the top

---

[4]According to Jackson, Fisher formulated the questions and interview scoring criteria in a manner that served to benefit Filler, to Jackson's detriment.

composite interview rating of 87, and Jackson ranked ninth with a rating of 66.  After the resume and interview scores were combined, Filler ranked first overall and Jackson ranked seventh overall.  Fisher recommended the top ranked candidate, Filler, for promotion to the SCS position.  On September 25, 2003, the Navy followed that recommendation.

D.   <u>Jackson's Written Reprimand</u>

In December 2003, Jackson filed a formal Complaint with the EEOC charging discrimination in his non-promotion to the SCS position.  The EEOC conducted a hearing in March 2005 and ruled in favor of the Navy.  Fisher participated as a witness in that hearing.  On July 12, 2005, Jackson filed the instant Complaint in the United States District Court for the District of Columbia.[5]

In mid-July 2005, Fisher assigned to Jackson a contract to modify.  According to Jackson, Fisher instructed him to make changes and then return the document to its originator and his immediate supervisor, Ms. Sandra Tyree ("Tyree").  The next day Fisher denied that she ever instructed Jackson to return the document to Tyree.  She instead claimed that she instructed Jackson to give the document to a different department for reissue.

---

[5]The case was transferred to the Eastern District of Virginia on February 15, 2006.  (Docket No. 10.)

Upset over Fisher's denial, Jackson requested a meeting with Fisher and Tyree.  The meeting took place in Tyree's cubicle on July 15, 2005.  At the meeting, Jackson pointed to the document in his hand and asked Fisher whether she had directed him to return it to its originator.  She once again denied it.  While the appropriateness of Jackson's response to her answer is in dispute, Jackson admittedly raised his voice and insisted that she told him to send the contract back to the originator.  At his deposition, Jackson testified:

> I did raise my voice, yes.  I wouldn't say that I raised my voice excessively to any particular point, but I am not, I mean, I do talk with emotion.  I do have some kind of emotion, some level of emotion when I'm making a point, and I do gesture with my hands.

(Docket No. 23, Ex. 11 at 21.)

Shortly thereafter, Fisher inserted a written reprimand into Jackson's personnel file.  In addition to identifying the behavior that Fisher found unacceptable, the reprimand stated:

> I consider it necessary to issue this letter to emphasize the importance of conducting yourself in an acceptable manner.  I will not tolerate outbursts like the one you displayed last Friday.  If you have an issue with a task or work assignment you should bring it to Ms. Tyree's and/or my attention and present it in a mature and civil tone.  Should you commit a subsequent offense of misconduct, and the date of the proposed disciplinary action for that offense is not more than two years from the effective date of this letter, a remedy from the next higher range of remedies may be proposed.  <u>A copy of this letter will be placed in your Official Personnel Folder (OPF) for a period of two years from its effective date, after which time it will be removed from your OPF</u>, After the two year period expires and letter is removed from your OPF, the letter may be considered when determining an appropriate remedy within a range of remedies for any subsequent offense.

(Docket No. 22, Ex. 37 at 2 (emphasis added).)   A copy of the reprimand letter was provided to Jackson on July 26, 2005.   The parties dispute whether Fisher knew at the time of the reprimand that Jackson had filed this federal action.   For the purposes of its analysis, however, the Court assumes that Fisher knew of the Complaint.

## II.   Principles of Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6]   Fed. R. Civ. P. 56(c); see also Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 513 (4th Cir. 2006); Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 449 (4th Cir. 2004).   A court "must take special care" when considering a summary judgment motion in

---

[6]Because the principles of summary judgment are well-established, further elucidation of those principles need not be provided here.   See Garrow v. Economos Props., Inc., 406 F. Supp. 2d 635, 638-39 (E.D. Va. 2005) (providing detailed description of summary judgment principles), aff'd, No. 06-1128, 2007 U.S. App. LEXIS 16553 (4th Cir. July 11, 2007); Taylor v. Wal-Mart Stores, Inc., 376 F. Supp. 2d 653, 657-58 (E.D. Va. 2005) (same), aff'd, 158 Fed. Appx. 446 (4th Cir. 2005); Puckett v. City of Portsmouth, 391 F. Supp. 2d 423, 430-31 (E.D. Va. 2005) (same).

an employment discrimination case because the employer's "motive
is often the critical issue." Beall v. Abbott Labs., 130 F.3d
614, 619 (4th Cir. 1997); Evans v. Techs. Applications & Serv.
Co., 80 F.3d 954, 958 (4th Cir. 1996); Ballinger v. N.C. Agric.
Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987).
Nevertheless, summary judgment remains an appropriate disposition
when the plaintiff is unable to prevail on his or her
discrimination claims as a matter of law. Beall, 130 F.3d at
619; Evans, 80 F.3d at 958-59.

### III.  Analysis

A federal employer may not discriminate against a federal
employee in any "personnel action" on the basis of race, sex,
age, or prior EEO activity.  42 U.S.C. § 2000e-16(a); 29 U.S.C. §
633a.  Because Jackson has not presented any direct evidence of
discrimination, the Court will examine his claims of
discrimination using the burden-shifting framework established by
the United States Supreme Court in McDonnell Douglas Corp. v.
Green, 411 U.S. 792 (1973).  See Hill v. Lockheed Martin
Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004);
Thompson, 312 F.3d at 649; Brinkley v. Harbour Rec. Club, 180
F.3d 598, 606-07 (4th Cir. 1999); El v. Tek Sys., Inc., 311 F.
Supp. 2d 516, 519 (E.D. Va. 2002); Wilder v. S.E. Pub. Serv.
Auth., 869 F. Supp. 409, 413 (E.D. Va. 1994).

     A.  <u>Disparate Treatment Claim</u>

To prevail on his disparate treatment claim for failure to promote, Jackson must prove that he was treated less favorably than the other applicants because of his race, sex, or age.  <u>See Anderson v. Westinghouse Savannah River Co.</u>, 406 F.3d 248, 268 (4th Cir. 2005); <u>Carter v. Ball</u>, 33 F.3d 450, 456 n.7 (4th Cir. 1994).  In order to establish a <u>prima facie</u> case, Jackson must prove that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for that position; and (4) the Navy rejected him for that position under circumstances giving rise to an inference of unlawful discrimination.  <u>See Anderson</u>, 406 F.3d at 268; <u>Williams v. Giant Food Inc.</u>, 370 F.3d 423,430 (4th Cir. 2004).

If Jackson establishes a <u>prima facie</u> case, the burden then shifts to the Navy to articulate a legitimate, nondiscriminatory reason for the decision to not promote him.  <u>See Anderson</u>, 406 F.3d at 268; <u>Lowery</u>, 158 F.3d at 760.  Once the Navy articulates such a reason, the burden then shifts back to Jackson to prove that the articulated reason is a mere pretext for discrimination. <u>See Anderson</u>, 406 F.3d at 268; <u>Lowery</u>, 158 F.3d at 760.

Jackson may prove pretext by showing that he was "better qualified" than Filler or "by amassing circumstantial evidence that otherwise undermines the credibility" of the Navy's stated reasons for the decision to pass Jackson over for the promotion. <u>Heiko v. Colombo Sav. Bank, F.S.B.</u>, 434 F.3d 249, 259 (4th Cir. 2006); <u>see Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S.

133, 146-49 (2000); Price v. Thompson, 380 F.3d 209, 213-14 (4th Cir. 2004); Dennis v. Columbia Collection Med. Ctr., Inc., 290 F.3d 639, 648 n.4 (4th Cir. 2002).  A prima facie case, coupled with probative evidence that the Navy's explanation is false, would counsel against a grant of summary judgment unless the Navy presented other strong evidence from which no reasonable factfinder could conclude that there was discrimination.  See Price, 380 F.3d at 214; see also Reeves, 530 U.S. at 148-49; Dennis, 290 F.3d at 648-49.

Finally, in assessing the Navy's decision not to promote Jackson, the Court will refrain from acting as a "super-personnel department that reexamines an entity's business decisions."  Id.; Garrow v. Economos Props., Inc., 406 F. Supp. 2d 635, 642 (E.D. Va. 2005), aff'd, No. 06-1128, 2007 U.S. App. LEXIS 16553 (4th Cir. July 11, 2007).  The crucial issue is whether the employer has an unlawfull discriminatory motive, not the wisdom or folly of the employer's business judgments.  Jiminez v. Mary Wash. Coll., 57 F.3d 369, 383 (4th Cir. 1995); Garrow, 406 F. Supp. 2d at 642.  Absent evidence of discriminatory intent, the Court will "leave to the employer's discretion the method of evaluating an employee's job performance."  Beall, 130 F.3d at 620.

Turning to the merits of the present case, Jackson has satisfied all four prongs of his prima facie case.  As a fifty-six (56) year old African-American male, Jackson clearly is a member of a protected class under Title VII.  There is also no dispute that he applied and was qualified for promotion to the

SCS position.  Further, Jackson has satisfied the fourth prong of his prima facie case because the vacant SCS position was filled by a younger, Caucasian female.  See Lowery, 158 F.3d at 760; Carter, 33 F.3d at 458.

The Navy has successfully rebutted Jackson's prima facie case by demonstrating that the selected candidate, Filler, had the highest combined resume and interview rating.  Jackson maintains that the Navy's articulated reason for denying him the promotion is a mere pretext, and he attempts to show pretext in two different ways.  First, Jackson maintains that he was more qualified than Filler, and thus, should have been selected by the review panel.  Second, Jackson argues that Fisher pre-selected Filler before the job vacancy was announced and that Fisher re-announced the position numerous times specifically to ensure that Filler was a candidate who could be selected.  Jackson asserts that Fisher then manipulated the selection process by deciding upon the panelists and writing all of the interview questions to guarantee that Filler was selected for the promotion even though Jackson was more qualified.  In sum, Jackson's second pretext argument is that preselection itself is a form of discrimination.

Jackson's claim fails as a matter of law because he has no evidence that the Navy's proffered reason for his non-selection is pretextual.  Simply put, Jackson can not escape the consequences of his own poorly written resume and weak interview performance.

B.   Pretext

1.   Qualifications

In conducting its pretext analysis, the Court must "assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question."  Heiko, 434 F.3d at 259.  Jackson "cannot establish [his] own criteria for judging [his] qualifications for the promotion.  [He] must compete for the promotion based on the qualifications established by [his] employer."  Anderson, 406 F.3d at 269.  Further, "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff."  Evans, 80 F.3d at 960-61 (quoting Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)); see also Beall, 130 F.3d at 620.

Jackson principally relies on his "paper" qualifications to show that he was more qualified than Filler for the SCS position.  For example, Jackson points to his Associates Degree in restaurant/hotel management, Bachelor's Degree in Business Management, and Master's Degree in Professional Arts, prior supervisory experience, Level III DAIWA Certification, and a panoply of other accomplishments that he deems relevant.

According to Jackson, Filler was less qualified.  At the time of her selection, Filler was only Level II DAWIA Certified with an Associates degree in Business Management.  Jackson asserts that a Level III DAWIA Certification and a Bachelor's degree are eligibility requirements for the SCS position.

17

Additionally, Jackson points out that he has more prior work experience as a GS-12 SCS than does Filler.

Jackson claims that Fisher discriminated against him by improperly weighting the selection criteria. Jackson argues that the interview questions were not properly weighted in that they focused principally on "contracting" knowledge rather than supervisory skills. (Docket No. 23 at 16.) Jackson further argues that the selection panel focused more on the candidates' ability to respond to the interview questions instead of focusing on their "expertise, experience and knowledge." (Docket No. 23 at 14-15.) In sum, Jackson maintains that the selection process improperly placed emphasis on knowledge of contracting and interview skills over the paper qualifications that he finds most important.

Jackson cannot define his own selection criteria, Anderson, 406 F.3d at 269, and despite his attempts to show otherwise, Filler was qualified for the vacant SCS position. A Bachelor's degree generally is required to qualify for a SCS position, 10 U.S.C. § 1724(b)(1); however, this educational requirement is waived for employees, such as Filler, who served as Contracting Specialists before September 30, 2000, 10 U.S.C. § 1724(c)(2). A Level III DAWIA Certification is also a general requirement to qualify for a SCS position. However, a candidate, such as Filler, who is Level II Certified and has significantly progressed towards Level III may be granted a waiver of the Level III certification requirement. 10 U.S.C. § 1724(d). Filler

received this waiver in November 2003, (Def. Ex. 36), and earned her Level III Certification on November 29, 2004, less than fourteen months after she was selected for the SCS position.

With respect to the selection process, Jackson has not shown that he was evaluated unfairly as compared to the other 10 candidates.  The Navy, through Fisher, chose to utilize a selection panel to review the eleven qualified candidates.  Each candidate's resume was reviewed and rated separately by the panelists.  The panel then utilized the same ten questions in the same order to interview and rate each candidate on a consistent basis.  Even if the panel favored form over substance in rating the resumes and favored interview performance over paper qualifications in the ultimate rankings, there is no evidence to suggest that these preferences were not applied equally when ranking all eleven candidates.

Based on the criteria utilized by the selection board, no factfinder could reasonably conclude that Jackson should have received a higher rating than Filler.  Filler's resume was well written and detailed whereas Jackson's resume was poorly written and general.  Filler's interview answers were detailed and demonstrated the problem-solving skills necessary for the desired position.  Jackson's answers, by contrast, were brief and lacked depth.  There is also no evidence in the record to suggest that any panelist rated candidates on the basis of discriminatory animus.

2.   <u>Preselection</u>

Jackson also contends that the Navy discriminated against him when the recommending official, Fisher, preselected Filler for the position.  Jackson speculates that Fisher strategically re-issued multiple job vacancy announcements and manipulated the interview process to ensure that Filler, a fifty (50) year-old white female, was selected for the promotion.

The conclusion that Fisher preselected Filler is not wholly fanciful given the sequence of job announcements and Fisher's selection of both the panelists and the questions they were to ask.  Preselection, even if accompanied by subsequent manipulation to guarantee that the preselected candidate gets the position over more qualified candidates, does not equate automatically to discrimination.  Preselection works to the detriment of all applicants, regardless of their race, age, or sex.  <u>Anderson</u>, 406 F.3d at 271; <u>Blue v. United States Dep't of the Army</u>, 914 F.2d 525, 541 (4th Cir. 1990).  While preselection shows that the selection process was unfair, it "does not by itself prove racial discrimination."  <u>Blue</u>, 914 F.2d at 541; <u>see Oates v. District of Columbia</u>, 824 F.2d 87, 93 (D.C. Cir. 1987) ("An ill-informed motivation, or even an illegal motivation, is not necessarily a discriminatory one . . . .").  "Title VII does not ensure the best will be selected -- only that the selection process will be free from impermissible discrimination."  <u>Casillas v. United States Navy</u>, 735 F.2d 338, 344 (9th Cir. 1984).  Without some evidence that Fisher's alleged pre-selection

of Filler was motivated by race, age or sex, Jackson has no claim.

Assuming that Filler was preselected, all of the applicants other than Filler were equally excluded from selection for the SCS position.  Preselection is discriminatory only if the decision-maker preselects the favored applicant due to an impermissible consideration.  Jackson has failed to link Fisher's preselection of Filler to an impermissible preference for younger, female, or Caucasian employees.  There is simply no evidence whatsoever in the record from which one could reasonably conclude that race, age, sex or any other improper motive was a factor in the promotion or preselection of Filler over Jackson.

_____B.__ Retaliation_

Jackson also alleges that the Navy discriminated against him a second time when Fisher inserted a written reprimand into his employment file over an incident that occurred two days after he filed his Complaint in this action.  (See supra, Section I(D).) Jackson claims that the reprimand constitutes an adverse employment action taken in retaliation for his protected action.

To establish a prima facie case of retaliation, Jackson must prove that: (i) he engaged in a protected activity; (ii) he suffered an "adverse employment action"; and (iii) a causal connection existed between the protected activity and the asserted adverse action.  See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004); Mackey v. Shalala, 360

F.3d 463, 469 (4th Cir. 2004); King v. Rumsfeld, 328 F.3d 145, 150-51 (4th Cir. 2003); Giang v. Potter, 369 F. Supp. 2d 763, 769 (E.D. Va. 2005).

To establish the existence of the second element, i.e., "adverse employment action," Jackson must prove that the Navy committed a discriminatory act that adversely affected the terms, conditions, or benefits of his employment.  See James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004); Thompson, 312 F.3d at 650-51; Von Gunten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001).  As the Fourth Circuit has noted, the appropriate focus is on "what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."  Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981).  Excluded from Title VII protection are those "many interlocutory or mediate decisions having no immediate effect upon employment conditions."  Id.

Jackson's claim for retaliation fails because there is no evidence in the record that he suffered any adverse effect on the terms, conditions, or benefits of his employment.  The principal retaliatory act that Jackson identifies is the written reprimand that Fisher placed in his personnel file.  While Jackson may subjectively view this as adverse, the reprimand had no impact on Jackson's rank, salary, or employment benefits.  Moreover, the reprimand was temporary in nature.  It was intended to remain in his Official Personnel Folder for only two years and was essentially a warning that future unprofessional behavior would

not be tolerated.   This interlocutory reprimand in no way changed the conditions of Jackson's employment.

## IV.  Conclusion

For the reasons stated above, defendant's Motion for Summary Judgment is **GRANTED.**

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____/s/_____
Walter D. Kelley, Jr.
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
July 21, 2007